## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

|  |  |
|---|---|
| **GREGORY D. RUSTIN,** | **CASE NO. 04-50890-NPO** |
| **DEBTOR.** | **CHAPTER 7** |
| **GREGORY DON RUSTIN** | **PLAINTIFF** |
| **V.** | **ADV. PROC. NO. 09-05100-NPO** |
| **MARTHA L. RUSTIN** | **DEFENDANT** |

### MEMORANDUM OPINION ON COMPLAINT

There came on for trial on September 9, 2011 (the "Trial"), the Complaint (the "Second Adversary Complaint") (Adv. Dkt. 1)[1] filed by the Debtor, Gregory Don Rustin ("Greg Rustin"), and the Answer and Affirmative Defenses to Plaintiff's Complaint (the "Second Adversary Answer") (Adv. Dkt. 5) filed by Martha L. (Susie) Rustin ("Susie Rustin") in the above-referenced adversary proceeding (the "Second Adversary"). At Trial, Allen Flowers represented Greg Rustin, and Robert Alan Byrd represented Susie Rustin. The Court finds for the reasons set forth below that the lump-sum alimony and attorney's fees awarded Susie Rustin in a state-court judgment are non-dischargeable support obligations under 11 U.S.C. § 523(a)(5).

### Jurisdiction

This Court has jurisdiction over the parties and the subject matter of this proceeding pursuant

---

[1] Citations to the record are as follows: (1) citations to docket entries in the main bankruptcy case, Case No. 04-50890-NPO, are cited as "(Dkt. ____)"; (2) citations to docket entries in this adversary proceeding, Adv. No. 09-05100-NPO (the "Second Adversary"), are cited as "(Adv. Dkt. ____)"; and (3) citations to docket entries in adversary proceeding number 04-05057-ERG (the "First Adversary"), are cited as "(Adv. No. 04-05057-ERG, Adv. Dkt. ____)".

to 28 U.S.C. § 1334. Susie Rustin disputes subject-matter jurisdiction, an issue that is addressed at length below. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I). Notice of the Trial was proper under the circumstances.

## Facts[2]

In the Amended Pretrial Order (the "Pretrial Order") (Adv. Dkt. 32), the parties stipulated to numerous facts relating to the history of their divorce. The Court adopts these stipulations as its findings of fact. In the discussion below, findings of fact that supplement these stipulations are based upon testimony and documentary evidence presented at Trial:

1.   Greg Rustin and Susie Rustin were married on October 25, 1974.

2.   Greg Rustin and Susie Rustin separated on March 13, 2002, when Greg Rustin left the marital home. Shortly thereafter, Susie Rustin filed a complaint for divorce.

3.   After multiple days of trial, the Chancery Court for the Second Judicial District of Jones County, Mississippi (the "Chancery Court"), rendered a judgment (the "Judgment of Divorce") (Joint Ex. 8)[3] in cause number 2002-0303, on February 10, 2004, granting Susie Rustin a divorce from Greg Rustin on the ground of adultery. On that same date, the Chancery Court issued a 77-page memorandum opinion, which was incorporated into the Judgment of Divorce (Joint Ex. 7) by reference.

4.   At the time of the divorce, Susie Rustin was 48, and Greg Rustin was 52.

---

[2] Pursuant to Federal Rule Civil Procedure 52, as made applicable by Federal Rule of Bankruptcy Procedure 7052, the following constitutes the findings of fact and conclusions of law of the Court.

[3] The joint trial exhibits are cited as "(Joint Ex. _____)". The trial exhibits of Greg Rustin are cited as "(Greg Rustin Ex. _____)", and the trial exhibits of Susie Rustin are cited as "(Susie Rustin Ex. _____)".

5.      Three children were born of the marriage, but only two of them, a son and daughter, were under the age of majority at the time of the divorce.

6.      The Judgment of Divorce provided, *inter alia*, the following:

(a)      The parties agreed that Susie Rustin would have physical custody of their daughter, and Greg Rustin would have physical custody of their son.

(b)      Greg Rustin was ordered to pay Susie Rustin child support in the amount of $600.00 per month.

(c)      The Chancellor approved the parties' stipulated procedure for the distribution of their personal property.  Susie Rustin would prepare two lists of personal property and Greg Rustin would select the list he wanted.  Susie Rustin would receive the property on the remaining list.

(d)      Susie Rustin was awarded: (1)  $50,000.00 from the sale of certain real properties, (2) the funds in her retirement account, and (3) $500,000.00 of the loss carry-forward resulting from the operation of a failed family business.

(e)      Greg Rustin was awarded: (1) $4,000.00 from the sale of certain real property, (2) unspecified funds he retained from the sale of other real property, (3) five business entities, (4) residential property known as the "Patel House," (5) any recovery from pending lawsuits filed against third parties for alleged wrongful acts, and (6) the loss carry-forward from a failed family business, less the $500,000.00 loss carry-forward assigned to Susie Rustin.

(f)      The business assets awarded to Greg Rustin were valued by the Chancery Court at $1,339,000.00, as of June 5, 2002.

(g)      Susie Rustin was awarded $2,000.00 per month as periodic alimony until Susie Rustin married or died, until Greg Rustin died, or until further order of the Chancery Court.

(h)      Susie Rustin was awarded lump-sum alimony in the amount of $550,000.00, payable in installments of $34,375.00 on the first day of January and the first day of July of each year, beginning on July 1, 2004, until paid in full.

(i)      To secure payment of the lump-sum alimony, Susie Rustin was awarded equitable liens on the Patel House and on the real property and equipment owned by the five business entities awarded to Greg Rustin.  She was also granted a lien on a pending lawsuit involving the five business entities.

(j)      Susie Rustin was awarded $35,110.83, plus interest at 8% annum, for payment of her attorney's fees.

7.      Greg Rustin filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on February 27, 2004 (Dkt. 1).

8.      On May 10, 2004, Susie Rustin filed a Complaint Objecting to Dischargeability of Debt Pursuant to Section 523(a)(15) (Joint Ex. 2) in the First Adversary, in which she alleged that the debts reflected in the Judgment of Divorce, to the extent they fell outside the purview of 11 U.S.C. § 523(a)(5), were non-dischargeable under 11 U.S.C. § 523(a)(15) (Adv. No. 04-05057-ERG, Adv. Dkt. 1).

9.      On May 18, 2004, Greg Rustin filed Gregrory (sic) D. Rustin's Answer to Martha L. Rustin's Complaint (Joint Ex. 3), alleging, *inter alia*, that the purported alimony and attorney's fees awarded by the Chancery Court were outside the scope of the exception in 11 U.S.C. § 523(a)(5).

10.      Greg Rustin appealed the Judgment of Divorce to the Mississippi Supreme Court on October 6, 2004.

11.      On November 10, 2005, the Mississippi Supreme Court affirmed the Judgment of Divorce (Joint Ex. 11) and on February 6, 2006, denied a motion for rehearing *en banc*.

12.      Greg Rustin has never paid any of the lump-sum alimony awarded to Susie Rustin.

13.      Both parties filed numerous post-judgment pleadings in Chancery Court seeking citations for contempt and/or modifications of the Judgment of Divorce.  According to the parties, only two of these pleadings are relevant to the present dispute: (1) Susie Rustin's Complaint for Citation for Contempt (the "First Contempt Complaint") filed on December 17, 2004, and (2) Susie Rustin's Complaint for Citation for Contempt (the "Second Contempt Complaint") (Joint Ex. 15)

filed on December 24, 2008.

14.     On May 18, 2006, the Chancery Court rendered a memorandum opinion and judgment (the "Contempt Judgment") that resolved: (1) the First Contempt Complaint and (2) Greg Rustin's Amended Cross-Complaint for Modification.  The Chancery Court fixed arrearages in lump-sum alimony of $137,500.00 (through January 2006) and in periodic alimony of $10,400.00 (through December 2005).   The Chancery Court also awarded Susie Rustin $41,797.50 to compensate her for the personal property sold or discarded by Greg Rustin.  Due to a material change in Greg Rustin's circumstances subsequent to the Judgment of Divorce, the Chancery Court reduced Susie Rustin's periodic alimony award from $2,000.00 per month to $400.00 per month, commencing on June 1, 2006. (Joint Ex. 14).  Greg Rustin did not appeal the Contempt Judgment.

15.     Greg Rustin was discharged from all pre-petition debts under 11 U.S.C. § 727, except as provided under 11 U.S.C. § 523, on July 24, 2006 (Joint Ex. 4), and his bankruptcy case was closed (Joint Ex. 5).

16.     The First Adversary was dismissed on November 26, 2008, after the parties "advised that the requested relief has been rendered moot" by the ruling of the Mississippi Supreme Court. (Adv. No. 04-05057-ERG, Adv. Dkt. 36).

17.     In Susie Rustin's Second Contempt Complaint, she alleged that Greg Rustin had again failed to pay his  alimony obligations and was in arrears in the total sum of $171,875.00 for the months of July 2006 through July 2008, together with all sums accruing after July 1, 2008.  This amount did not include the $137,500.00 that the Chancery Court had previously ordered Greg Rustin to pay for past due lump-sum alimony on May 18, 2006, in the Contempt Judgment.

18.     On January 29, 2009, Greg Rustin filed a Motion to Dismiss, Answer to Complaint

for Citation for Contempt and Counter-Complaint for Modification (the "Motion to Dismiss") (Joint Ex. 16) in the Chancery Court. Greg Rustin denied that the Chancery Court had subject-matter jurisdiction on the ground that the "judgment" had been discharged in his bankruptcy case. In the alternative, Greg Rustin asked the Chancery Court to cease or reduce all alimony to Susie Rustin, due to a material change in his health and a reduction in his income. The Motion to Dismiss is still pending before the Chancery Court.

19.    On September 5, 2009, Greg Rustin filed a Motion to Reopen Case to Pursue Discharge Violations and for Other Relief (Dkt. 92). Susie Rustin filed a Response to Debtor's Motion to Reopen Case to Pursue Discharge Violations and for Other Relief (Dkt. 94) on September 28, 2009. After a hearing, this Court reopened Greg Rustin's chapter 7 case by Order on Motion to Reopen Case (Dkt. 102) on November 20, 2009.

20.    On December 4, 2009, Greg Rustin filed the Second Adversary Complaint, asking that this Court "determine and order that the 'lump sum alimony' award to Martha of $550,000.00 is not actually in the nature of alimony, maintenance or support, and thus was discharged in Greg's Chapter 7 discharge order." (Adv. Dkt. 1). Further, Greg Rustin alleged that the Second Contempt Complaint filed by Susie Rustin in the Chancery Court violated the discharge injunction in 11 U.S.C. § 524.

21.    On January 14, 2010, Susie Rustin filed the Second Adversary Answer in which she denied, *inter alia*, Greg Rustin's allegation that the "lump-sum alimony" was discharged in his bankruptcy case. Susie Rustin contends that prior to the July 24, 2006 discharge, the Chancery Court entered the Contempt Judgment that reduced unpaid alimony obligations to fixed amounts. Because Greg Rustin never appealed the Contempt Judgment, it became a final order of the Chancery Court.

Susie Rustin argues that no obligations owed her in the Judgment of Divorce were discharged in Greg Rustin's chapter 7 case, and none of her actions to enforce the Judgment of Divorce violated 11 U.S.C. § 524.

22.    In the Second Adversary, the Pretrial Order was entered on August 16, 2011. Trial was held on September 9, 2011.

### Discussion

The issue before this Court is whether "lump-sum alimony" awarded to Susie Rustin by the Chancery Court is a non-dischargeable support obligation under 11 U.S.C. § 523(a)(5),[4] or a component of the equitable distribution of the parties' marital assets, and, thus, dischargeable.  If it is dischargeable, then the Court must determine whether Susie Rustin's Second Contempt Complaint constituted a willful violation of the discharge injunction.

**A.    Jurisdiction/Preclusion Issues**

The parties dispute whether this action is subject to adjudication in this forum.  Greg Rustin maintains that subject-matter jurisdiction is proper.  Susie Rustin asserts the <u>Rooker-Feldman</u> doctrine and the equitable defenses of laches and waiver, and *res judicata*.  The Court addresses the <u>Rooker-Feldman</u> issue first because it concerns the subject-matter jurisdiction of the Court.  Then, the Court considers the issues of laches, waiver, and *res judicata* raised by Susie Rustin before reaching the merits of the parties' dispute.

---

[4] Because Greg Rustin filed his petition for relief prior to October 17, 2005, this action is governed by the version of the Bankruptcy Code in effect before the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 215(1)(H), 119 Stat. 23, 54 (2005) ("BAPCPA").  Unless otherwise noted, all code sections will hereinafter refer to the pre-BAPCPA version of the Bankruptcy Code located at Title 11 of the United States Code.

1.     **Rooker-Feldman** **Doctrine**

In her Second Adversary Answer and in the Pretrial Order, Susie Rustin contends that the Rooker-Feldman doctrine bars this Court from exercising its subject-matter jurisdiction. She views the Second Adversary as an indirect attempt by Greg Rustin to appeal the Judgment of Divorce.

The Rooker-Feldman doctrine is a judicially-created doctrine "confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005). The doctrine precludes jurisdiction when three requirements are met: "(1) the party against whom the doctrine is invoked must have actually been a party to the prior state-court judgment or have been in privity with such a party; (2) the claim raised in the federal suit must have been actually raised or inextricably intertwined with the state-court judgment; and (3) the federal claim must not be parallel to the state-court claim." Lance v. Dennis, 546 U.S. 459, 462 (2006) (citation omitted). The doctrine is not triggered simply by the entry of a state-court judgment or by the pendency of parallel state-court litigation. Exxon Mobil Corp., 544 U.S. at 292.

The United States Supreme Court has applied the doctrine only twice, and then only in the two cases that gave the doctrine its name. *See* Dist. of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983) (federal district courts lack subject-matter jurisdiction to review a final state-court judgment); Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) (federal district courts lack appellate authority to reverse or modify a state-court judgment). Recently, the Supreme Court urged a narrow application of the doctrine. Skinner v. Switzer, 131 S. Ct. 1289, 1297 (2011). "Neither Rooker nor Feldman elaborated a rationale for a wide-reaching bar on the jurisdiction of lower federal courts."

Lance, 546 U.S. at 464.

The Court concludes that the Rooker-Feldman doctrine does not apply here because the dischargeability issue under § 523(a)(5) was never considered by the Chancery Court. A federal court with proper jurisdiction is not barred from hearing an action merely because it involves the same subject matter as that of a state-court matter. McClellan v. Carland, 217 U.S. 268, 281 (1910). "If consideration and decision have been accomplished, action in federal court is an impermissible 'appeal' from the state court decision. . . . If no consideration has been given, or any decision on the matter is ambiguous, it is unlikely that the issues presented to the state high court and to the federal court are so 'inextricably intertwined' that the federal court cannot take jurisdiction." Herman v. Neely (In re Herman), 315 B.R. 381, 388-89 (Bankr. E.D. Tex. 2004) (citations omitted). As succinctly stated by the Fifth Circuit, the doctrine generally applies only where a plaintiff seeks relief that directly attacks the validity of an existing state-court judgment. Weaver v. Texas Capital Bank N.A., 2011 U.S. App. LEXIS 20964 (5th Cir. Oct. 17, 2011). The Second Adversary does not require this Court to revisit the support awards or their amounts. Therefore, the Rooker-Feldman doctrine does not bar this action, and this Court has subject-matter jurisdiction over this claim. That conclusion, however, does not dispose of the other defenses raised by Susie Rustin, which the Court considers next.

## 2.     Laches and Waiver

### a.     Laches

Laches is an equitable doctrine that was first recognized as a rule of law in Mississippi in Comes v. Tapley, 57 So. 567 (Miss. 1911):

Laches, in legal significance, is not mere delay, but delay that works a disadvantage

> to another. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed that he cannot be restored to his former state, if the right be then enforced, delay becomes inequitable, and operates as estoppel against the assertion of the right.

Id. at 573. In determining whether to apply laches, the Mississippi Supreme Court considers three separate factors: (1) the delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted. Merchants & Farmers Bank v. State ex rel. Moore, 651 So. 2d 1060 (Miss. 1995). "Delay is not laches unless it results in hardship to another." Id. at 1063. Susie Rustin did not offer sufficient evidence at Trial that she sustained any undue prejudice as a result of Greg Rustin's failure to raise the dischargeability issue earlier in the Chancery Court. She was certainly aware of the issue in light of the First Adversary, which she initiated.

### b.   Waiver

To establish a waiver in Mississippi, there must be proof of an act or omission on the part of the one charged with the waiver that fairly evidences an intent permanently to surrender the right alleged to have been waived. Taranto Amusement Co. v. Mitchell Assocs., 820 So. 2d 726, 729 (Miss. Ct. App. 2002). Assumably, the basis for Susie Rustin's waiver defense is Greg Rustin's consent to the dismissal of the First Adversary. That dismissal, however, was "without prejudice" and does not indicate an intention by Greg Rustin to abandon his allegation that his debts were discharged.

### 3.   *Res Judicata*

Susie Rustin contends that the Contempt Judgment constitutes a final judgment that

precludes this action for declaratory relief under principles of *res judicata*. She points out that Greg Rustin could have argued in defense of the Contempt Judgment that the lump-sum alimony was discharged in his bankruptcy, but he failed to do so.

In determining the preclusive effect of an earlier state-court judgment, federal courts apply the preclusion law of the state that rendered the judgment. Marrese v. Amer. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 381 (1985). Because the Contempt Judgment was issued by a Mississippi Chancery Court, Mississippi preclusion law applies. Under Mississippi law, claim preclusion or *res judicata* precludes all claims that were, or reasonably may have been, brought in the original action. DeFoe v. Great S. Nat'l Bank, N.A., 547 So. 2d 786, 788 (Miss. 1989). In divorce actions, for example, *res judicata* generally precludes chancellors from modifying support obligations in the absence of a post-judgment material change in circumstances. Bowe v. Bowe, 557 So. 2d 793 (Miss. 1990).

The resolution of this issue is relatively clear because the United States Supreme Court in Brown v. Felsen, 442 U.S. 127, 133-39 (1979), specifically held that *res judicata* does not apply in bankruptcy non-dischargeability proceedings, like this one. *See* Archer v. Warner, 538 U.S. 314, 319 (2003) (reaffirming Brown). Although the related principle of collateral estoppel (issue preclusion) does apply to bankruptcy non-dischargeability proceedings, that issue was not raised by Susie Rustin. *See* Mozingo v. Correct Mfg. Corp., 752 F.2d 168, 172 (5th Cir. 1985) (collateral estoppel is an affirmative defense that if not pled is considered waived). Accordingly, the Court concludes that under Brown, *res judicata* does not bar this action.

**B.**      **§ 523(a)(5)**

Generally, the discharge of debts under chapter 7 of the Bankruptcy Code eliminates all of

a debtor's pre-petition obligations, subject to certain express exceptions found in § 523(a). Two of those exceptions apply to domestic obligations. First, debts (a) owed by a debtor to his former spouse, (b) arising under a divorce decree, and (c) in the nature of alimony, maintenance, or support are non-dischargeable under § 523(a)(5).[5] Second, marital debts that are not support obligations are non-dischargeable under § 523(a)(15),[6] unless (a) the debtor is unable to pay such debts, and (b) the

---

[5] The pre-BAPCPA version of § 523(a)(5) provides in relevant part that:

(a)      A discharge . . . does not discharge an individual debtor from any debt–

***

(5)      to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that –

***

(B)      such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

11 U.S.C. § 523(a)(5).

[6] The pre-BAPCPA version of § 523(a)(15) provides that a discharge does not discharge an individual debtor from any debt:

(15)     not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless –

(A)      the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B)      discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(a)(15).

benefit that the debtor would receive from the discharge would be greater than the harm that the discharge would cause to the non-debtor spouse. Whereas § 523(a)(15) "requires the Court to review the impact of the obligations on the current circumstances of the parties and consequences of the discharge of those obligations on both parties," subsequent events are irrelevant to the § 523(a)(5) inquiry. Moyer v. Schloemer (In re Moyer), 2010 Bankr. LEXIS 3890, at *21 (Bankr. S.D. Miss. Nov. 5, 2010).

At Trial, Greg Rustin agreed that his failure to initiate an adversary proceeding in bankruptcy court in a timely manner to invoke the provisions of § 523(a)(15) regarding non-support obligations, bars him from doing so now. *See* Fed. R. Bankr. P. 4007. Greg Rustin also agreed that the following obligations ordered by the Chancery Court, as modified in the Contempt Judgment, are non-dischargeable support obligations under § 523(a)(5): (1) all child support; (2) all periodic alimony; and (3) $41,797.50 awarded to Susie Rustin in compensation for the loss of her personal property. The essential question presented here is whether the $550,000.00 lump-sum alimony award in the Judgment of Divorce is a debt actually in the nature of support under § 523(a)(5). If so, then the Court must determine whether the attorney's fees in the amount of $35,110.83 awarded to Susie Rustin in the Judgment of Divorce are also in the nature of a support obligation under § 523(a)(5).

1.    **Burden of Proof**

The burden of proving the true nature of a debt rests with the party who opposes the discharge, and the court is permitted to rely on extrinsic evidence in making its determination. Id. The burden of proof rests on the creditor regardless of "whether the creditor is the plaintiff or defendant." Moyer, 2010 Bankr. LEXIS 3890, at *28 (citing Casini v. Graustein (In re Casini), 307 B.R. 800 (Bankr. D.N.J. 2004)). Requiring the objecting party to carry the burden of proof comports

with the policy behind federal bankruptcy law which favors discharge in an effort to provide the debtor with a fresh start. 4 <u>Collier on Bankruptcy</u> ¶ 523.05 (16th ed. 2010).  Accordingly, Susie Rustin bears the burden of proving the non-dischargeability of the lump-sum alimony by a preponderance of the evidence.  <u>See</u> <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991) (preponderance of the evidence standard applies to all discharge exceptions contained in § 523(a)); Fed. R. Bankr. P. 4005.

### 2.     Whether Lump-Sum Alimony Is Equitable Distribution by Another Name

Except for the division of certain personal property and the physical custody of the children, the Judgment of Divorce was the result of the Chancellor's decision after a protracted trial. Therefore, this Court begins its analysis by examining the intent of the Chancellor in awarding Susie Rustin "lump-sum alimony" of $550,000.00, given the circumstances of the parties at the time of the divorce in 2004.  The result of this inquiry into the Chancellor's intent is not binding on this Court because the determination of whether a marital debt is in the nature of alimony, maintenance, or support is a matter of federal bankruptcy law, not state law.  *See* <u>Biggs v. Biggs (In re Biggs)</u>, 907 F.2d 503, 506 (5th Cir. 1990) (characterizing obligations in divorce decree as non-dischargeable alimony even though state law did not sanction alimony as a matter of public policy).  Nevertheless, the Chancellor's reasoning and intent carry evidentiary weight.

Section 523(a)(5) expressly exempts from discharge debts incurred from awards of "alimony," the same term used by the Chancellor in the Judgment of Divorce.  Why, then, should this Court ignore the label used by the Chancery Court in determining the true nature of the $550,000.00 "lump-sum alimony" award?  The Fifth Circuit has held that it is the responsibility of the bankruptcy court to determine the true nature of a debt regardless of the label attached to it in the

state-court proceeding.  Benich v. Benich (In re Benich), 811 F.2d 943, 945 (5th Cir. 1987).  On the

other hand, the Fifth Circuit has also held that a bankruptcy court may not consider extrinsic

evidence where both the form and substance of the provision at issue clearly establish the nature of

the debt as either support or as property settlement.  Milligan v. Evert (In re Evert), 342 F.3d 358

(5th Cir. 2003).  The issue here then is whether the "lump-sum alimony" award, in both form and

substance, establishes the true nature of the obligation.

     During the Trial, the Court asked counsel whether the parties considered the characterization

of the award to Susie Rustin of $550,000.00 as ambiguous, given that the Chancellor called it "lump-

sum alimony" in the Judgment of Divorce.  Both answered the question in the negative.  Susie Rustin

maintained that the label chosen by the Chancellor demonstrated that he clearly intended for the

award to provide financial relief to her based on the couple's income disparity.  Greg Rustin, on the

other hand, insisted that the Chancellor's use of the label showed that he clearly intended for the

award to effectuate an equitable division of their marital property based on Susie Rustin's past

contributions to the marriage as a homemaker.  Their positions are not as different as one might first

think because of the close and complicated relationship between lump-sum alimony and the

equitable distribution of marital property in Mississippi.  Because the Chancellor presumably based

the lump-sum alimony award on the dictates of state law, as it then existed, the Court digresses

briefly to discuss the development of alimony in Mississippi.

     **a.**     **Alimony**

     In 1848, when marriages were supposed to last a lifetime, Mississippi enacted legislation

authorizing chancery courts to award alimony.   Deborah H. Bell, Mississippi Family Law § 9.01[4]

(2005).  Since then, the alimony provision in the divorce statute has remained almost unchanged.

*See* Miss. Code Ann. § 93-5-23 (Supp. 2011).[7]  Notably, there are no detailed guidelines in the statute to assist chancellors in determining whether to award alimony or how much to award.  There is only the statutory requirement that the award be "equitable and just."  In the absence of specific alimony guidelines, chancery courts historically based the right to alimony on the continuing legal duty of the husband to support his wife.  Deborah H. Bell, <u>Mississippi Family Law</u> § 9.01[4] (2005).  Alimony helped the wife maintain her position in life after her divorce.  <u>Robinson v. Robinson</u>, 72 So. 923 (Miss. 1916).  For the most part, chancellors used the marital standard of living as a gauge in determining a reasonable amount of alimony.  *See* <u>Miller v. Miller</u>, 159 So. 112 (Miss. 1935).

In 1856, in <u>Armstrong v. Armstrong</u>, 32 Miss. 279 (1856), the Mississippi Supreme Court recognized, perhaps for the first time, that the divorce statute authorized chancellors to award alimony in lump sum. Later, in <u>Aldridge v. Aldridge</u>, 27 So. 2d 884, 885-86 (Miss. 1946), the Mississippi Supreme Court sanctioned payment of lump-sum alimony in installments.

### b.    Distribution of Marital Property and the Title Theory

Until the mid-twentieth century, Mississippi, like most other common-law states, divided property between divorcing couples based upon a "title theory." Chancellors awarded marital property based on which spouse held title to it and had no power to divest title from one spouse to

---

[7] Section 93-5-23 provides, in pertinent part, as follows:

> When a divorce shall be decreed from the bonds of matrimony, the court may, in its discretion, having regard to the circumstances of the parties and the nature of the case, as may seem equitable and just, make all orders touching . . . the maintenance and alimony of the wife or the husband, or any allowance to be made to her or him, and shall, if need be, require bond, sureties or other guarantee for the payment of the sum so allowed.

Miss. Code Ann. § 93-5-23 (Supp. 2011).

the other, notwithstanding any contribution made toward the accumulation of that property by the dependent spouse during the marriage.  Hinton v. Hinton, 179 So. 2d 846, 848 (Miss. 1965) (farmer's wife was not entitled to interest in land titled solely in husband's name).  Under the title system, alimony was a financially dependent wife's only source of post-divorce support.

c.      **Lump-Sum Alimony**

Beginning in the 1970s, the Supreme Court of Mississippi gradually began chipping away at the "title theory" to alleviate its unfairness to traditional homemakers who greatly contributed to the accumulation of marital property but who had no claim to it because they did not hold title to any of it. *See* Thomas W. Crockett & Walter P. Neeley, Mississippi's New Equitable Distribution Rules: The Ferguson Guidelines and Valuation, 15 Miss. C.L. Rev. 415, 416-24 (1995).  Lump-sum alimony became a means for adjusting an otherwise unfair distribution of marital assets under the "title theory." *See, e.g.*, Bowe, 557 So. 2d at 794.

During this period, the Mississippi Supreme Court announced four factors in awarding lump-sum alimony in the seminal case of Cheatham v. Cheatham, 537 So. 2d 435 (Miss. 1988):

(1)      the substantial contribution to the accumulation of total wealth of the payor either by quitting a job to become a housewife or by assisting in the spouse's business;

(2)      a long marriage;

(3)      where the recipient spouse has no separate income or the separate estate is meager by comparison; and

(4)      the receiving spouse would lack any financial security without the lump-sum award.

Cheatham, 537 So. 2d at 438.   According to the Mississippi Supreme Court, "the single most important factor . . . is the disparity of the separate estates."  Cheatham, 537 So. 2d at 438.  Lump-

sum alimony "is a settlement between the husband and the wife as to the interest of the latter in his property, and as to the extent of the husband's duty to contribute to her maintenance and support." Retzer v. Retzer, 578 So. 2d 580, 591 (Miss. 1990). "[T]he husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay." Brennan v. Brennan, 638 So. 2d 1320, 1324 (Miss. 1994); see Hemsley v. Hemsley, 639 So. 2d 909, 915 (Miss. 1994) (recognizing a presumption that the services of a homemaker are equal to the services of the wage-earner).

### d.    Equitable Distribution Doctrine and Abandonment of the Title Theory

In 1994, the Mississippi Supreme Court in its landmark decision in Ferguson v. Ferguson, 639 So. 2d 921 (Miss. 1994), abandoned the "title theory" altogether and formally adopted the doctrine of equitable distribution. The equitable distribution doctrine required chancellors to focus upon the identification and equitable division of marital property and debts first, and only thereafter to consider alimony. With the adoption of the equitable distribution doctrine, lump-sum alimony lost its key role as a substitute for transferring marital assets. The Mississippi Supreme Court outlined the process courts must follow in applying the Ferguson factors in Johnson v. Johnson, 650 So. 2d 1281 (Miss. 1994).

> First, the character of the parties' assets, i.e., marital or nonmarital, must be determined . . . . The marital property is then equitably divided . . . . If there are sufficient marital assets which . . . will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered.

Id. at 1287.

###### e.      Lump-Sum Alimony after <u>Ferguson</u>

Turning to the Second Adversary, all of the cases cited so far in this brief discussion of the development of alimony were rendered before the issuance of the Judgment of Divorce.  Indeed, the Chancellor discussed and relied upon <u>Ferguson</u> and <u>Hemsley</u> in rendering his decision.  At this juncture, the parties part ways in their interpretation of alimony law after <u>Ferguson</u> and their position regarding the Chancellor's actual intent.  At Trial, Susie Rustin presented the testimony of her divorce attorney, Terry Caves ("Caves"), and Greg Rustin, in turn, presented the testimony of his divorce attorney, Thomas Tucker Buchanan ("Buchanan").  Caves and Buchanan were proffered without objection and were accepted by the Court as experts in the field of domestic relations law in Mississippi (Greg Rustin Ex. 2; Susie Rustin Ex. 1).

Caves testified that after <u>Ferguson</u>, chancellors used lump-sum alimony not only as a tool to transfer marital assets but also as a means to supplement periodic alimony.  In this way, lump-sum alimony replaced a spouse's loss of wage earning capacity that the spouse otherwise would have enjoyed if the marriage had continued.  According to Caves, the Mississippi Supreme Court after <u>Ferguson</u> has affirmed awards of lump-sum alimony when application of the <u>Cheatham</u> factors revealed that a wife would not be able to retain the same standard of living that she enjoyed prior to the divorce.  <u>Pearson v. Pearson</u>, 761 So. 2d 157, 165 (Miss. 2000).

For example, the Mississippi Supreme Court in <u>Kilpatrick v. Kilpatrick</u>, 732 So. 2d 876, 882 (Miss. 1999), remanded and instructed the chancery court to recalculate a lump-sum alimony award in the amount of $35,000.00 on the ground that the award was relatively low and unjustified based upon the disparity in the parties' income.  The wife had no means of support other than her job as a teacher, and the husband, an attorney, had a work history of significantly higher wages.  In

Kilpatrick, the court's remand on the basis of alimony was separate and distinct from the court's remand based upon the distribution of property.  Id. at 881.

Additionally, Caves testified that in Davis v. Davis, 832 So. 2d 492 (Miss. 2002), the Mississippi Supreme Court upheld a lump-sum alimony award of $50,000.00 based upon a wife's financial insecurity post-divorce.  Id.   The wife was financially insecure and would have to find work again as a nurse, whereas her husband was a doctor earning over $400,000.00 per year.

In contrast, Buchanan testified that chancellors never award lump-sum alimony as a mode of support.  Basing lump-sum alimony on a husband's future income would be too speculative and unfair, according to Buchanan.  Buchanan further testified that lump-sum alimony does not share the traditional characteristics of a support obligation like periodic alimony, because lump-sum alimony is not modifiable and does not terminate upon death.  Armstrong v. Armstrong, 618 So. 2d 1278, 1281 (Miss. 1993).  "Lump-sum alimony is intended to serve as an equitable remedy and 'is a final settlement, not subject to modification.'"  George v. George, 22 So. 3d 424, 429 (Miss. Ct. App. 2009) (citing Hubbard v. Hubbard, 656 So. 2d 124, 129 (Miss. 1995)).  He argued that the cases that followed Ferguson considered lump-sum alimony as nothing more than property distribution under the guise of alimony.  See Dickerson v. Dickerson, 34 So. 3d 637, 646-47 (Miss. Ct. App. 2010) (in a two and one-half year marriage, in which the wife possessed a real estate license and was living with a man who could provide for her, the court held that "lump-sum alimony is closely tied to equitable distribution, and it is really nothing more than equitable distribution in the form of cash."); George, 22 So. 3d at 429 ("A chancellor utilizes lump-sum alimony as a tool in equitably distributing marital assets.").

Buchanan primarily relied on Haney v. Haney, 907 So. 2d 948 (Miss. 2005) ("Haney III").[8] In Haney III, the Mississippi Supreme Court noted that prior to Ferguson, lump-sum alimony "was often used, as it was essentially the only method available to a chancellor for the transfer of what is now termed 'marital property.'" Haney III, 907 So. 2d at 952.

The Court finds that in the decade following Ferguson, during the same time period when the Chancellor issued the Judgment of Divorce, lump-sum alimony was not used exclusively for equitable distribution purposes but still played a role in providing support within the meaning of § 523(a)(5). After Ferguson, chancellors used modern alimony, albeit as a *secondary* form of marital support, to balance income-disparity when financial equity could not be achieved through the equitable distribution of marital property. Deborah H. Bell, Mississippi Family Law § 9.01[2] (2005) (citing Ferguson, 639 So. 2d at 921).

Buchanan's reliance on Haney III is misplaced because it was issued after the Judgment of Divorce, and, therefore, to the extent it embodied a change in the law (which both parties denied), it is irrelevant to the Chancellor's intent at the time of the parties' divorce in 2004. Moreover, Haney III involved facts distinguishable from those in the present case. In Haney III, the couple was married for only seventeen months, never had any children, and never actually lived together. Haney III, 907 So. 2d at 949. Additionally, at the time of their marriage, the couple had "substantial

---

[8] Haney III was the third appeal filed in this case. In Haney v. Haney, 788 So. 2d 862 (Miss. Ct. App. 2001) ("Haney I"), the Mississippi Court of Appeals held that the chancery court applied the wrong factors in awarding lump-sum alimony. On remand, the chancery court awarded the wife the same amount of lump-sum alimony that he had previously awarded. On further appeal, the Mississippi Supreme Court again reversed, holding that the chancellor failed to provide a proper analysis in support of the award. Haney v. Haney, 881 So. 2d 862 (Miss. Ct. App. 2003). Based on the decision in Haney II, the Mississippi Supreme Court granted certiorari. Haney III, 907 So. 2d at 949.

separate estates." Id.  Upon this factual background, the chancery court stated "lump-sum alimony is a tool to assist a chancellor in transferring assets to a spouse who has no legal title, but who contributed to the accumulation of property in the marriage." Id. at 952.  The Haney III court held that although the chancellor labeled the distribution as lump-sum alimony, it was no more than an unjustified equitable distribution, because the wife did not substantially contribute to the accumulation of the property. Id. at 955.  Here, however, there is a long marriage, three children, substantial marital assets, and evidence of significant contributions by Susie Rustin.

Assuming for the sake of argument that Haney III supports Buchanan's position, the Mississippi Supreme Court has more recently held in Rogillio v. Rogillio, 57 So. 3d 1246 (Miss. 2011), that lump-sum alimony is intended to supplement periodic alimony for ongoing support after the division of property, which is consistent with the case law in place at the time the Chancellor rendered his decision. Rogillio, 57 So. 3d at 1250 (citing Deborah H. Bell, Mississippi Family Law § 9.02[2][a][ii]).  The Mississippi Supreme Court in Rogillio described lump-sum alimony as "'a means of adjusting financial inequities that remain after property division.'" Rogillio, 57 So. 3d at 1250 (quoting Deborah H. Bell, Mississippi Family Law § 9.02[2][a][ii]).  Not only does Rogillio make no mention of Haney III, but Justice Jess H. Dickinson, who authored Haney III, joined in the Rogillio majority.  To the extent Haney III represents a departure from prior case law, the Mississippi Supreme Court reverted to the law as it existed under Ferguson.

In short, the Court finds that in certain circumstances the Mississippi Supreme Court has held that lump-sum alimony may provide support within the meaning of § 523(a)(5).  In other words, the Court finds that alimony can serve different roles, even dual roles, depending upon the circumstances of the parties.  The Court next considers the intent of the Chancery Court in fixing the lump-sum

award and the purpose of the lump-sum award in light of the financial circumstances of the parties at the time of the divorce in this particular case.

**3.      Whether the Chancellor Intended the $550,000.00 as Support or Property Distribution**

Greg Rustin and Susie Rustin were married for 28 years.  Susie Rustin has a master's degree in education and in the first few years of her marraige worked as a high school teacher.  Her teacher's certificate had expired at the time of the divorce.  The extent of Greg Rustin's higher education was one and one-half years of junior college.  He was self-employed as a carpenter when the couple first married.  In 1979, Greg Rustin was seriously injured in a motor vehicle accident.  Susie Rustin quit her job as a school teacher to care for Greg Rustin and did not return to permanent, full-time work outside the home until after their separation.  As a result of a settlement in a lawsuit arising out of the car accident, Greg Rustin received the net sum of $70,000.00, which he invested into a construction business.  In 1989, he began a poultry supply business, which he sold almost four years later for $1.7 million.  After the sale of the poultry business, the couple began living an extravagant lifestyle.  They moved into a spacious home, vacationed in Europe, took ski trips, and increased the quantity and quality of their personal property.  Later, Greg Rustin became involved in multiple commercial enterprises and began experiencing financial difficulties.  In 2002, the couple decided to sell their home and move temporarily into a smaller rental house.   At this time, the couple separated.  The buyers of the couple's former residence paid Greg Rustin part of the purchase price by conveying the Patel House appraised at $267,500.  Greg Rustin and another woman moved into the Patel House.  Susie Rustin eventually moved out of the rental house and into a two-bedroom apartment.

When the Chancellor equitably divided the marital property, he valued the business assets

awarded to Greg Rustin at $1,339,000.00 as of June 5, 2002. After completing the division of all of the marital assets, he then awarded Susie Rustin periodic alimony and lump-sum alimony in the same, self-contained paragraph.

Based on the above underlying facts, this Court finds that the award of lump-sum alimony was intended as support in the nature of alimony and served that purpose within the meaning of § 523(a)(5). By awarding Susie Rustin lump-sum alimony, the Chancellor gave Susie Rustin an opportunity to retain the same standard of living that she had enjoyed while married to Greg Rustin. The Chancellor, after noting Susie Rustin's grim financial outlook, recognized: (1) that Greg Rustin had a significantly higher earning capacity than Susie Rustin, and (2) that Susie Rustin's standard of living was significantly curtailed when the divorce forced her to move from a spacious house into a rental house, and, finally, into a two-bedroom apartment. Notably, the Chancery Court did not attempt to link the lump-sum alimony award of $550,000.00 to the sale of any particular marital assets, but apparently based it upon Susie Rustin's financial need. The award was a settlement "to the extent of [Greg Rustin's] duty to contribute to [Susie Rustin's] maintenance and support." Miller, 159 So. at 112. Additionally, it was intended as a non-modifiable supplement to the award of periodic alimony. Although Greg Rustin maintained that the form of the lump-sum alimony award was inconsistent with the form of a traditional alimony award, the issue here is not governed by the form, but by the function of the award.

**4.    Whether the Attorney's Fees Award of $35,110.83 Constitutes "Support" under § 523(a)(5)**

Having concluded that the award of lump-sum alimony is in the nature of support under § 523(a)(5), the Court must determine whether the attorney's fees award of $35,110.83 in the

Judgment of Divorce is likewise excepted from discharge.  Stated another way, the issue is whether

the debt for attorney's fees is so directly related to the award of lump-sum alimony as to constitute

a support obligation.  The Fifth Circuit addressed this issue in <u>Joseph v. J. Huey O'Toole, P.C. (In

re Joseph)</u>, 16 F.3d 86 (5th Cir. 1994), where it held that a debtor's obligation to pay attorney's fees

incurred by his wife in divorce proceedings was non-dischargeable under § 523(a)(5).  The Fifth

Circuit noted that the award of attorney's fees reflected a balancing of the parties' financial needs.

<u>Id.</u> at 88; *see also* <u>Hudson v. Raggio & Raggio, Inc. (In re Hudson)</u>, 107 F.3d 355 (5th Cir. 1997)

(attorney's fees in child support litigation are non-dischargeable under § 523(a)(5) because they inure

to the benefit and support of the child).  For this same reason, the Court finds that the attorney's fees

award at issue here is a non-dischargeable support obligation.

**Conclusion**

In conclusion, Susie Rustin has established by a preponderance of the evidence that the lump-

sum alimony awarded to her by the Chancery Court was in the nature of alimony, maintenance and

support within the meaning of § 523(a)(5).  Accordingly, this Court concludes that the lump-sum

alimony and the attorney's fees awarded in the Judgment of Divorce are non-dischargeable.[9]

In accordance with Rule 7058 of the Federal Rules of Bankruptcy Procedure, the Court will

enter a separate final judgment consistent with this Memorandum Opinion.

SO ORDERED.

_____
Neil P. Olack
United States Bankruptcy Judge
Dated:  November 9, 2011

_____

[9] Due to the non-dischargeable nature of these debts, Susie Rustin's state-court efforts to
collect the lump-sum alimony and attorney's fees did not violate the discharge injunction under
§ 523(a)(1).